UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **CHERYL CROCHET, ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO: 22-1103 C/W 23-333** |
| **SEADRILL AMERICAS, INC., ET AL** | **SECTION: "S" (1)** |

## ORDER AND REASONS

**IT IS HEREBY ORDERED** that the **Motion for Summary Judgment** (Rec. Doc. 65) filed by defendant, Seadrill Americas, Inc. ("Seadrill") is **DENIED**.

## BACKGROUND

This case arises from Christopher Crochet's death by a heart attack while he was aboard the M/V WEST NEPTUNE. At the time, movant Seadrill was performing work for LLOG Exploration Company, LLC ("LLOG") pursuant to a contract under which Seadrill provided the WEST NEPTUNE for drilling offshore wells, and Crochet was employed as a shop technician for Frank's Frank's International, LLC ("Frank's International"). Frank's International was performing work for LLOG pursuant to a Master Services Contract with LLOG, in connection with LLOG's work drilling offshore on the WEST NEPTUNE. At approximately 5:30 p.m. on March 18, 2021, Crochet went to the medic on board complaining of abdominal cramping.[1] The medic, Emily Schreiber, was an employee of Safety Management Systems, LLC ("SMS"), with whom Seadrill had contracted to provide professional medical services on board the M/V WEST

---

[1] Rec. Doc. 65-8, SMS Incident Report, 2-3; Rec. Doc 65-9, U.S. Dept. of Interior Incident Report, 2.

NEPTUNE. LLOG had agreed to provide medical evacuations for all personnel aboard the vessel.

Crochet informed the medic that he had a history of experiencing the same symptoms after eating raw or not fully cooked onions, and it was "normal for him."[2] The medic did not perform a comprehensive exam or take Crochet's vital signs, instead having a patient-medic conversation and performing repeated wellness checks.[3] Crochet denied having chest pain, shortness of breath, difficulty breathing, nausea, or vomiting.[4] He was not sweating (non-diaphoretic), and the medic noted good skin color.[5] It was agreed he would report to his room for rest, and the medic would check on him periodically.[6]

Soon thereafter, the medic informed Seadrill's Offshore Installation Manager ("OIM"), Jon Mitchell, that Crochet had presented to her with complaints of gastric discomfort.[7] The medic reported to Mitchell that Crochet's symptoms were mild, and that she simply wanted to let him know that she was monitoring the situation.[8] The medic checked on Crochet at 6:00 p.m.,

---

[2] Rec. Doc. 65-8, 2.

[3] Rec. Doc. 65-8, 1-2

[4] Id.

[5] Id.

[6] Id.

[7] 65-5, Declaration of Jon Mitchell, ¶12.

[8] Id. at ¶13.

6:30 p.m., and 7:15 p.m.[9] On each occasion, Crochet reported that he was feeling better.[10]

According to his written statement, Jessie Courville, a Frank's Deepwater supervisor on the WEST NEPTUNE, went to check on Crochet after he learned that Crochet had gone to the medic.[11] Crochet told Courville that he had gas pains, but that "he gets gas pains all the time."[12] Courville asked Crochet if he needed a flight to go ashore, which Crochet declined.[13]

Collin Thibodaux, the other Frank's deepwater supervisor onboard the WEST NEPTUNE, also provided a written statement on the night of the incident.[14] According to Thibodaux, he checked on Crochet in his room at about 6:00 p.m., and Crochet told him he was feeling better.[15] After Thibodaux ate dinner, he again checked on Crochet, who was "joking" with Thibodaux.[16]

---

[9] Rec. Doc. 65-9 at 2.

[10] Id.

[11] Rec. Doc. 65-10, Written Statement of Jessie Courville. In their Statement of Contested Facts, plaintiffs neither admit or deny the truth of Courville's statement, noting that they have not had an opportunity to depose him. The court's findings herein do not rely on Courville's statement.

[12] Id.

[13] Id.

[14] Rec. Doc. 65-11, Written Statement of Collin Thibodeaux. In their Statement of Contested Facts, plaintiffs neither admit or deny the truth of Thibodeaux's statement, noting that they have not had an opportunity to depose him. The court's findings herein do not rely on Thibodeaux's statement.

[15] Id.

[16] Id.

At 8:00 p.m. the medic went to check on Crochet and found him on the floor, unresponsive and with no pulse.[17] At 8:09 p.m., John Telano, the foreman for the vessel's operator, LLOG, ordered and arranged for an emergency helicopter evacuation of Crochet from the vessel.[18] Extensive resuscitation efforts were undertaken while awaiting the medical evacuation.[19] The emergency helicopter departed Galliano at 8:49 p.m. and arrived on the M/V WEST NEPTUNE at 9:45 p.m.[20] Crochet did not survive, and was pronounced dead at 8:51 p.m., shortly after being evacuated.[21]

Plaintiffs Cheryl Crochet and Alexandria Crochet have filed this wrongful death and survival action asserting that Seadrill is vicariously liable for the negligent actions of its independent contractor, SMS, which failed in its duty to provide adequate medical care to Crochet while on board the M/V WEST NEPTUNE. Plaintiffs have also alleged direct negligence against Seadrill for failing to provide adequate medical care.

Seadrill has moved for summary judgment, arguing that as a matter of law, it cannot be liable for the acts of its independent contractor, SMS. Plaintiffs contend that because Seadrill exercised operational control over SMS, it is liable for SMS's negligence. Plaintiffs' opposition also raises an additional argument that dismissal of Seadrill is improper because Seadrill was

---

[17] Id.; Rec. Doc. 65-8, 3.

[18] Rec. Doc. 65-9, 2.

[19] Rec. Doc. 65-8, 3-5.

[20] Id.

[21] Rec. Doc. 59-2, Lafourche Parish Coroner's Office Autopsy Report, 8.

directly negligent in connection with Crochet's death.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Granting a motion for summary judgment is proper if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits filed in support of the motion demonstrate that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." Beck v. Somerset Techs., Inc., 882 F.2d 993, 996 (5th Cir. 1989) (citing Anderson, 477 U.S. 242 (1986).

If the moving party meets the initial burden of establishing that there is no genuine issue, the burden shifts to the non-moving party to produce evidence of the existence of a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The non-movant cannot satisfy the summary judgment burden with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

If the opposing party bears the burden of proof at trial, the moving party does not have to submit evidentiary documents properly to support its motion, but need only point out the absence of evidence supporting the essential elements of the opposing party's case. Saunders v.

Michelin Tire Corp., 942 F.2d 299, 301 (5th Cir. 1991).

## APPLICABLE LAW

A principal is not liable for injuries resulting from the negligent acts of an independent contractor unless "(1) the liability arises from ultrahazardous activities performed by the contractor on behalf of the principal or (2) the principal retains operational control over the contractor's acts or expressly or impliedly authorizes those acts." Coulter v. Texaco, Inc., 117 F.3d 909, 911–12 (5th Cir. 1997). Because drilling is not an ultrahazardous activity, only the operational control prong of this test potentially applies in this case. Ainsworth v. Shell Offshore, Inc., 829 F.2d 548, 550 (5th Cir. 1987).

In determining the issue of operational control, courts consider whether and to what extent the right to control work has been contractually retained by the principal. Coulter, 117 F.3d at 912 (citations omitted). Courts also consider whether the principal exercised actual control over the contractor. Coleman v. BP Expl. & Prod., Inc., 19 F.4th 720, 729 (5th Cir. 2021). These two considerations "do not weigh equally. . . contractual retention weighs heavier." Id. 729–30 (5th Cir. 2021) (citing Echeverry v. Jazz Casino Co., L.L.C., 988 F.3d 221, 232 (5th Cir. 2021)).

A principal's reservation of the right to monitor its contractor's performance and station a "company man" on the platform "who observes the contractor's activities, has the right to make safety recommendations to the contractor, and is obligated to report continuing unsafe work practices or conditions to his . . . superiors, does not mean that the principal controls the methods or details of the contractor's work." Coulter, 117 F.3d at 912. "Operational control exists only if

the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way." Fruge ex rel. Fruge v. Parker Drilling Co., 337 F.3d 558, 564 (5th Cir. 2003). Thus, the issue in this case is whether Seadrill retained contractual control over SMS, and/or controlled the step-by-step processes of SMS's work.

## DISCUSSION

*Contractual control*

Seadrill contends that it did not retain contractual control over plaintiff. In so arguing, it points to the following language contained in the parties' agreement:

> [Seadrill] shall have no direction or control of [SMS] or its employees, agent, representatives, or subcontractors; [Seadrill] being interested only in the results obtained. The actual performance and superintendence of all services and work performed hereunder shall be by [SMS], but [Seadrill] and its representatives shall have unlimited access to the operations.[22]

Plaintiffs point to other contractual language, which they contend reserves operational control to Seadrill:

> [Seadrill] will provide [SMS] with copies of [Seadrill's] standards, policies and procedures for medical care to be rendered to its personnel, and [SMS] shall work with such resources and within such policies and procedures. [Seadrill] will also provide [SMS] with prompt notice of any future changes to such standards, policies, and procedures.[23]

Plaintiffs contend that this is not a general requirement for SMS to comply with Seadrill's

---

[22] Rec. Doc. 65-4, 9, Master Service Agreement ("MSA") between Seadrill and SMS ¶ 13.

[23] Id. at 2, ¶ 4.

7

corporate policies, but rather requires compliance with Seadrill's medical care policies and procedures, and thus amounts to contractual retention of direct control over SMS's medical care operations.

The language relied upon by plaintiff does not authorize the kind of step-by-step operational control or prohibit SMS from doing its work in its own way as required by the Fifth Circuit in Fruge, supra, that would establish the contractual retention of operational control. Rather, it reflects that Seadrill contracted for SMS to provide medical services consistent with its own policies and procedures for medical care. Including a requirement of adherence to its own policies and procedures does not amount to directing SMS's performance step-by-step, or prohibiting SMS from doing its work in its own way. In contrast, the language pointed to be Seadrill is unequivocal that the intent of the agreement is for Seadrill to have no direction or control of SMS or its employees, agents, representatives, or subcontractors. Accordingly, the court holds that the contract did not provide for Seadrill to retain operational control over SMS.

***Actual operational control notwithstanding the contract language***

As to actual operational control, as previously noted, "'[o]perational control' exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way . . . " Fruge, 337 F.3d at 564. This "step-by-step process" has been defined as a situation where a principal substitutes the independent contractor's entire method and manner of operation for one of its own. Romero v. Mobil Expl., 727 F. Supp. 293 (W.D. La. 1989), aff'd 939 F.2d 307 (5th Cir. 1991). Setting general work priorities is not the same as prescribing a step-by-step process for completing a

task. Coleman, 19 F.4th at 730. Requiring compliance with safety rules generally does not establish operational control as a matter of public policy. Id.

Plaintiffs make two arguments for actual operational control. First, they note that subsequent to the incident involving Crochet, Seadrill consultant Robina McCann[24] provided a report making recommendations for medical treatment protocols going forward. They argue that the recommendations go to the details of how SMS's work specifically must be carried out, and illustrates that SMS does exercise operational control. Second, they point to two charts present on board the M/V NEPTUNE, one captioned "Medical Care Assessment & Management Protocol, and one captioned "Responsibilities – Who Does What"[25], and argue that the charts include specific instructions SMS must follow that amount to providing step-by-step instructions and prohibit SMS from freely performing their work under the contract.

With respect to the Seadrill report, Seadrill's consultant identified actions that Seadrill should require of its medical contractor going forward, including:

> 1. All presentations of illness on Seadrill operations shall have a full set of vital signs and a blood sugar performed by the medic. I see this as a minimum standard people would expect if they attended an emergency department.
>
> 2. If people attend with red flag potential pain conditions (abdomen . . . . ) then the medic shall use the SMS clinical pathways and escalate the case via phone to the Topside physician. . . .
>
> 3. As we have stated for Seadrill to meet its global standards of

---

[24] According to Seadrill, McCann is an independent contractor of Seadrill employed by International SOS Assistance UK Ltd., who provided corporate medical advisor services to Seadrill from London, England.

[25] Rec. Doc. 70-5. Copy attached.

care the escalation of cases should occur routinely and involve a Topside physician oversight.[26]

Plaintiffs argue that even though these directives were made post-accident, they demonstrate that Seadrill expected to and did exert step-by-step operational control by Seadrill over the manner in which SMS medics do their work. They claim that at a minimum, genuine fact issues are present.

Plaintiffs also emphasize the "Medical Care Assessment & Management Protocol" and "Responsibilities – Who Does What" chart as evidence of Seadrill's operational control. The chart seems to merely delineate the distribution of responsibilities among the various medical providers, i.e., the rig medic, the local medical provider, and Topside support, and provide various contact information. Nothing about it suggests an attempt to direct the actual operations of the providers, but merely to illustrate what each one is responsible for as an aid for them and to avoid confusion.

Whether the Medical Case Assessment & Management Protocol indicates actual operational control is a harder question. It is explicit as to the medic's specific job duties, i.e., assess and stabilize, and significantly, to call Topside per the Seadrill manual to allow Topside to recommend emergency disembarkation or not. This is the very task at issue in the instant case– i.e., whether disembarkation should have been initiated sooner or not, and Seadrill's directive, contained in its chart, provides explicit instructions concerning steps the medic must take to determine whether to disembark a crew member. At a minimum, this raises a fact issue regarding the extent of Seadrill's actual operational control. In the presence of a factual issue as to whether

---

[26] Rec. Doc. 70-2, 1. A Topside physician provides medical care to crew members and medical advice and guidance to the medical professionals on board the vessel from ashore.

Seadrill exercised actual operational control over SMS, Seadrill is not entitled to summary judgment based on SMS's independent contractor status.

Because the court finds that summary judgment is inappropriate based on the sole issue presented in the instant motion, i.e. SMS's independent contractor status, the court pretermits discussion of plaintiffs' alternative argument against summary judgment, i.e. that Seadrill was directly negligent. Accordingly,

**IT IS HEREBY ORDERED** that the **Motion for Summary Judgment** (Rec. Doc. 65) filed by defendant, Seadrill Americas, Inc. ("Seadrill") is **DENIED**.

New Orleans, Louisiana, this __5th__ day of November, 2024.

**MARY ANN VIAL LEMMON**
**UNITED STATES DISTRICT JUDGE**